UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHAD S. HALL, SR., | ) | CASE NO. 4:17CV1327 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES S. GWIN |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

Plaintiff Chad S. Hall, Sr. ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. In his brief on the merits, Plaintiff asserts that the administrative law judge ("ALJ") violated the treating physician rule and lacked substantial evidence for her RFC for him. ECF Dkt. #13. For the following reasons, the undersigned recommends that the Court REVERSE the decision of the ALJ and REMAND the instant case.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on October 21, 2013 and November 15, 2013, respectively. ECF Dkt. #11 ("Tr.") at 212-219.[2] He alleged disability beginning March 21, 2012 due to problems with both knees, his right arm and his lower back. *Id.* at 249. The Social Security Administration ("SSA") denied his applications initially and upon reconsideration. *Id.* at 142-164. Plaintiff requested a hearing before an ALJ, which was held on October 2, 2015. *Id.* at 30, 165-166.

On February 24, 2016, the ALJ issued a decision denying Plaintiff's applications for DIB

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than when the Transcript was compiled. This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

and SSI.  Tr. at 16-23.  On June 23, 2017, Plaintiff filed the instant suit seeking review of the ALJ's decision.  ECF Dkt. #1.  He filed a brief on the merits on October 9, 2017 and Defendant filed her merits brief on November 7, 2017.  ECF Dkt. #s 13, 14.  Plaintiff filed a reply on November 21, 2017.  ECF Dkt. #15.

## II.  RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.  Relevant Medical Evidence

On April 21, 2009, Plaintiff began treating with Dr. Sutton, a pain management physician, for his low back, leg and right shoulder pain.  Tr. at 386.  Dr. Sutton noted that Plaintiff had a history of lumbarization of S1, L5-S1 herniated nucleous pulposus ("HNP") with a left foraminal paramedian disc impinging nerve roots, right supraspinatus tendon tear, tobacco abuse, nephrolitiasis, and an avulsion fracture of the humeral head on the right.  *Id.*  Plaintiff described his pain as continuous aching, throbbing, and sharp, with shooting pain sometimes.  *Id.*  He indicated that he has had such pain for years and he was pain-free when he takes his medications.  *Id*.  Plaintiff explained that the pain slowed him down at work and was better when he was supine and propped up his legs.  *Id.*  Dr. Sutton listed Plaintiff's medications as OxyContin, Toxicodone and Trazodone.  *Id*.  Upon examination, Dr. Sutton found that Plaintiff had:  normal strength, except decreased strength at 3-4/5 in the left lower extremity for foot dorisflexion, knee flexion and extension; normal muscle tone; intact sensation, except for decreased 10 gm filament sensation at the left lower extremity; negative straight leg raising; no neurological deficits; positive seated and stand forward bending tests on the left; and left iliac crest elevated versus right.  *Id.* at 387.  Dr. Sutton diagnosed Plaintiff with HNP lumbar myelopathy, short leg, acquired, tobacco abuse, lumbarization at S1, and sleep disturbance.  *Id*.  He refilled Plaintiff's medications, drew blood and ordered other studies.  *Id*.  X-rays dated April 27, 2009 of Plaintiff's postural lumbar spine showed a Schmorl node impression along the anteroinferior margin of L1 vertebral body.  Tr. at 328.  On upright postural views, a 1/8- inch shortening of the right lower extremity was noted with no sacral base unleveling.  *Id.*  On the upright view of the thoracolumbar spine, slight scoliosis was noted convex to Plaintiff's right at T7-T8.  *Id.*

On May 5, 2009, Plaintiff followed up with Dr. Sutton. Tr. at 384. Dr. Sutton noted that Plaintiff's behavior did not match his pain levels reported at 10/10. *Id.* He informed Plaintiff that his glucose levels were high and the postural study showed a 1/8" shortening of his right lower extremity with level sacral base and slight convex right scoliosis at T7-T8. *Id.* He diagnosed lumbarization, HNP lumbar myelopathy, short leg, acquired, tobacco abuse, and lumbar foraminal stenosis. *Id.* He refilled Plaintiff's prescriptions. *Id.*

X-rays of Plaintiff's right knee dated March 10, 2010 showed a small amount of joint fluid, and a chronic medial retinaculum injury could not be excluded due to the location of the reference marker and Plaintiff's pain. Tr. at 331. It was noted that Plaintiff injured his right knee 12 years ago and he had intermittent right knee swelling and pain. *Id.*

Plaintiff continued to follow up with Dr. Sutton for pain in his left hip, right arm, low back, right knee and right knee swelling from June 4, 2009 through January 16, 2015. Tr. at 363-388, 448-509, 545-563, 667-676. Dr. Sutton ordered radiographic studies for Plaintiff on March 1, 2010, and on March 7, 2011, he informed Plaintiff that if he did not get a MRI by the next office visit, Plaintiff needed to find a new doctor. *Id.* at 349. Plaintiff got the MRI before his May 2, 2011 visit. *Id.* at 346. Results from the right knee MRI on April 27, 2011 showed that Plaintiff had: a small to moderate joint effusion predominantly at the medial aspect; a signal which could represent a small tear at the posterior horn of the lateral meniscus; no distinct tear at the medical meniscus; a signal suggestive of small contusion at the medial proximal tibia; findings suggestive of chondromalacia patella; fluid near the medial meniscus; findings suggestive of edema or developing osteochondral pathology at the adjacent articular cartilage; and mild degenerative spurring. Tr. at 418.

At his May 2, 2011 visit with Dr. Sutton, they reviewed the results of the April 27, 2011 MRI Tr. at 346. On June 28, 2011, Dr. Sutton referred Plaintiff to Dr. Woods, an orthopedic surgeon, for his right knee. *Id.* at 342.

On September 9, 2011, Plaintiff presented to the emergency room due to right shoulder pain. Tr. at 393. Physical examination showed decreased range of motion and tenderness in the right shoulder, but no swelling, effusion, edema, deformity, laceration or spasm. *Id.* X-rays showed a

-3-

small calcification at the lateral aspect of the proximal humerous which was possibly related to calcific tendinitis. *Id.* at 395, 420.  A possible rotator cuff injury was noted.  *Id.*

Dr. Sutton noted at Plaintiff's September, 22, 2011 visit that he presented with a cane and he stated that he had been working a lot of overtime lately.  Tr. at 338.  He admitted having gait difficulties.  *Id.*  Physical examination showed normal strength in the upper extremities and lower, except for 4/5 left lower extremity strength for foot dorsiflexion, knee flexion and extension.  *Id.*  Plaintiff had positive pain with his right upper extremity shoulder abduction against resistance, and mild tenderness over course of bicipital tendon in the right upper extremity.  *Id.*  Dr. Sutton diagnosed lumbar foraminal stenosis, short leg, acquired, HNP lumbar myelopathy, scoliosis, lumbarization, and rotator cuff syndrome.  *Id.*  He noted that he had recommended that Plaintiff stop smoking and lose weight, but Plaintiff had not made any progress on either.  *Id.* at 338-339.

On November 18, 2011, Plaintiff presented to Dr. Sutton and reported that his right arm pain was worsening and his right knee pain went all the way to his ankle.  Tr. at 334.  He indicated that he was trying to schedule knee surgery and he had torn his rotator cuff and would need surgery on that as well, but it was a worker's compensation claim.  *Id.*  Physical examination findings were the same as found on September 22, 2011.  *Id.*

Treatment notes of Dr. Sutton indicate that Plaintiff continued to follow up with him for pain management of his torn lateral meniscus of the right knee, lumbarization, Schmorl's node, foraminal lumbar stenosis, HNP lumbar myelopathy, chondromalacia patellae, scoliosis, obesity, and tobacco abuse.  Tr. at 448-504.  Plaintiff complained of left hip, right arm, left leg, low back, and right knee and leg pain.  *Id.* at 448.  In January of 2012, it was noted that Plaintiff was using a cane and wearing a knee brace and he admitted having gait difficulties.  *Id.* at 506.

On January 16, 2012, Plaintiff presented to the emergency room complaining of pain everywhere for the last five days.  Tr. at 396.  He reported shoulder, knee, low back, neck and joint pain.  *Id.*  Physical examination revealed tenderness to the right and left shoulders, but normal ranges of motion, no bony tenderness, and no edema, swelling or effusion.  *Id.* at 397.  Plaintiff also exhibited tenderness of the right and left knees, but normal ranges of motion, no swelling and no

-4-

effusion. *Id.* Plaintiff's lumbar back showed decreased range of motion, bony tenderness and pain, but no swelling or edema. *Id.* He was diagnosed with chronic generalized pain and discharged. *Id.*

On March 9, 2012, Plaintiff presented for follow up with Dr. Sutton using a cane and wearing a knee brace. Tr. at 502. He indicated that he needed a letter from Dr. Sutton for his employer that he needed to be off of work to have surgery in order to keep his job. *Id.* Dr. Sutton wrote a letter for Plaintiff to be off of work so that he could have right knee arthroscopic surgery. *Id.* at 503.

On March 26, 2012, Plaintiff presented to the emergency room complaining of an aching right knee with constant pain for the last week. Tr. at 399. Physical examination showed tenderness of the right knee, with decreased range of motion, swelling, and effusion. *Id.* at 400. He was diagnosed with knee pain and discharged. *Id.* at 401.

On June 1, 2012, Plaintiff presented to Dr. Sutton and requested an updated letter for his employer to remain off of work. Tr. at 496. He requested another letter on July 2, 2012. *Id.* at 494. Dr. Sutton noted that he would follow up with Dr. Shaer, the orthopedic doctor, as to scheduling Plaintiff for right knee surgery and Dr. Sutton requested a progress note or letter from Dr. Shaer in order to continue Plaintiff's time off of work. *Id.* at 495.

On January 24, 2013, Plaintiff followed up with Dr. Sutton and he indicated that he went to Florida for a couple of weeks over the holidays in order to help paint a house. Tr. at 480. He indicated that he had twisted his right leg again and it was hurting. *Id.* He asked for a note or letter from Dr. Sutton to Medicaid indicating that he could not work until he had surgery so that he could get some help from Medicaid. *Id.* Dr. Sutton gave Plaintiff a letter, but he noted in his file that Plaintiff needed surgical intervention for his knee repair, and while he needed a referral to orthopedics, Plaintiff could not afford it because he was trying to get insurance in place but had not been able to do so yet. *Id.* Dr. Sutton indicated that he discussed with Plaintiff that further damage could be caused to his knee and he should not wait too long to have surgery. *Id.*

On February 21, 2013, Plaintiff presented to Dr. Sutton for follow up and a urine drug screen came up abnormal. Tr. at 478-479. He tested positive for Oxycodone, Oxymorphone and

Benzodiazepines. *Id.* at 478. It was noted that Restoril, which Plaintiff was prescribed, is a Benzodiazepine but should have come up as Temazepam. *Id.* Dr. Sutton discussed the abnormal results with Plaintiff and he was given a one-year Narcotic Probation letter and informed that he would be discharged if his next urine screen was abnormal. *Id.*

In his treatment notes, Dr. Sutton continued to advise Plaintiff to stop smoking and to lose weight. Tr. at 350, 453, 457, 459, 461, 463, 465, 467, 473, 662. Dr. Sutton noted that Plaintiff did not quit smoking and failed to lose any significant amount of weight. *Id.*

On June 25, 2013, Plaintiff arrived at the emergency room after he was on a ladder cutting down a tree branch when the branch fell on him. Tr. at 414. He complained of left chest, abdomen and hip pain. *Id.* X-rays of Plaintiff's head, chest, abdomen, cervical and thoracic spines, and pelvis showed normal results. *Id.* at 422-428. A CT of the lumbar spine showed questionable nondisplaced fractures of the right transverse process of L3 and L4 vertebrae. *Id.* at 427. However, another CT of the lumbar spine was conducted and compared with the prior CT scan and it showed no evidence of an acute fracture or dislocation, although there was mildly decreased L5-S1 intervertebral disc space with vacuum phenomena noted. *Id.* at 429. It was noted that Plaintiff left the emergency room against medical advice. *Id.*

On June 26, 2013, Plaintiff returned to the emergency room. Tr. at 414. The medical records noted Plaintiff's prior visit and that he left against medical advice after he was told he was not going to get his home dose of Roxicodone. *Id.* He complained of left hip pain and chronic right knee and back pain at the present visit. *Id.* at 414-415. Physical examination showed decreased range of motion, tenderness, and bony tenderness in the left hip, but no swelling or deformity. *Id.* at 409. He was diagnosed with left hip pain and after a consultation with orthopedic surgery, physical therapy was recommended. *Id.* at 416-417.

Plaintiff was assessed by a physical therapist for his left hip pain on August 6, 2013. Tr. at 435. Eight visits were recommended in order to increase his left hip strength and functional level and to decrease his hip pain with activity. *Id.* at 437. His prognosis was fair. *Id.* at 436. On September 5, 2013, Plaintiff was discharged from physical therapy due to three consecutive absences without prior notification. *Id.* at 444.

-6-

Dr. Sutton continued to monitor Plaintiff and on November 11, 2013, Plaintiff followed up and reported that his hip was doing a little better and he was scheduled to see an orthopedic surgeon again in January of 2014.  Tr. at 460.  Upon examination, Plaintiff had normal strength in his upper extremities and right lower extremity, but 4/5 strength in his left lower extremity for foot dorsiflexion, knee flexion and extension.  *Id.*  He also had positive pain in his right upper shoulder abduction against resistance.  *Id.*  His medications of Roxicodone and Restoril were continued.  *Id.*

Plaintiff followed up with Dr. Sutton on a monthly basis throughout 2014.  On January 6, 2014, Plaintiff reported that he was sore from riding in the car over the past few weeks and he had visited his grandchildren in Chicago.  Tr. at 456.  He reported sleep disturbance, and review of his symptoms was positive for arthralgia of hips, knees and shoulders, myalgia of the low back and legs, numbness and tingling in his knee and ankle, and gait difficulty and it was noted that he used a knee brace and cane.  *Id.* at 450, 452, 454, 456.  Upon examination, Plaintiff had normal strength in his upper extremities and right lower extremity, but 4/5 strength in his left lower extremity for foot dorsiflexion, knee flexion and extension.  *Id.*  He also had positive pain in his right upper shoulder abduction against resistance.  *Id.*  His medications were continued.  *Id.*  On April 3, 2014, Plaintiff reported that Dr. Shaer required a new referral, which was sent by Dr. Sutton.  *Id.* at 450-451.  On May 2, 2014, Plaintiff reported lower back, shoulder, hip and knee pain that rated 10/10 and decreased to 8/10 with medications.  *Id.* at 448.  His gait difficulties were again noted and he was wearing a knee brace and using a cane.  *Id.*  Dr. Sutton's late 2014 treatment notes indicate that Plaintiff underwent three injections in his right knee and an injection in his left hip on November 6, 2014.  *Id.* at 549.  At the November 6, 2014 follow up, Plaintiff reported that he was going to see Dr. Shaer on December, 11, 2014.  *Id.*

Plaintiff indicates in his brief on the merits that he treated with Dr. Kopey, a physiologist on October 7, 2014, October 14, 2014, October 21, 2014, and January 30, 2015, but the records submitted do not show the details of these visits.  ECF Dkt. #13 at 13, citing Tr. at 564-574.

On January 16, 2015, Dr. Sutton's follow up treatment notes indicate that Plaintiff reported that Dr. Kopey tried taking fluid out of his knee, but nothing would come out.  Tr. at 545.  He reported that his knee was hurting more since that time.  *Id.*

-7-

Dr. Kopey ordered a MRI of Plaintiff's lumbar spine on February 9, 2015. Tr. at 636. The results showed that Plaintiff had disc desiccation with partial disc height loss at L4-L5 level with circumferential disc bulge and mild facet arthropathy with broad-based disc protrusion in the left foraminal region causing at least moderate left neural formaminal stenosis. *Id*.

On February 12, 2015, Plaintiff followed up with Dr. Sutton for his left hip, right arm, left leg, knees, low back pain, shoulder stiffness and pain, sleep disturbances,and anxiety. Tr. at 675. He was using a cane and knee brace, and he reported gait difficulties and that he was having right knee surgery with Dr. Gentile on April 20, 2015. *Id*. He requested a referral to Dr. Kopey for his shoulder pain on both sides. *Id*. Physical examination showed that Plaintiff had normal strength in his upper and lower right extremity, with 4/5 strength in his left lower extremity for foot dorsiflexion, knee flexion and extension and positive pain with right upper extremity shoulder abduction against resistance. *Id*. He also had decreased range of motion in his knees, and numbness and tingling in his hips, knee and ankle. *Id.* Dr. Sutton diagnosed long-term medication use, chondromalacia patellae, scoliosis, Schmorl's node in the lumbar spine, lumbarization, lumbar foraminal stenosis, obesity, tobacco abuse, and noncompliance with medical treatment. *Id*. at 675. Plaintiff was told to stop smoking and to lose weight. *Id.* Dr. Sutton wrote a slip to Ohio Job & Family Services stating that Plaintiff was unable to work for 6 months to 1 year. *Id*. at 676.

On February 25, 2015, Dr. Kopey reviewed the results of the MRI with Plaintiff, which showed facet arthropathy with upper lumbar facet effusions and DDD. Tr. at 627, citing Tr. at 634. Plaintiff reported that his pain was getting worse in the lower back, left hip and right knee, and ice, narcotics and sleep helped relieve the pain. *Id*. Dr. Kopey's physical examination noted that Plaintiff had no falls or gait dysfunction and his gait presented as normal, with no effusion, swelling or erthyema, and negative straight leg-raising, but a tender left hip and lumbar paraspinals, and pain with passive left hip internal rotation *Id*. at 629. She diagnosed him with chronic left hip pain, lumbar facet arthropathy, degenerative joint disease ("DJD") of the hip and osteoarthritis of the hip. *Id.* She recommended lumbar facet blocks and left hip injections, a knee brace, and continuance of Plaintiff's medications. *Id.*

-8-

On March 12, 2015, Plaintiff followed up with Dr. Sutton for his left hip, right arm, left leg, knees, low back pain, shoulder stiffness and pain, sleep disturbances, and anxiety.  Tr. at 671.  He reported that he cancelled his appointment with Dr. Gentile set for later this day because he was told to wait until he was done with 2 weeks of physical therapy.  *Id.* at 673.  He had a steroid shot in his hips on March 9, 2015 and he was scheduled to get nerve blocks in his back on March 13, 2015.  *Id.*  He was on Chantix for smoking and said that it was helping him.  *Id.*  He was using a cane and knee brace and he reported gait difficulties.  *Id.* Physical examination showed that Plaintiff had normal strength in his upper and lower right extremity, with 4/5 strength in his left lower extremity for foot dorsiflexion, knee flexion and extension and positive pain with right upper extremity shoulder abduction against resistance.  *Id.* He also had decreased range of motion in his knees and numbness and tingling in his hips, knee and ankle.  *Id.*  Dr. Sutton diagnosed knee effusion, acquired short leg, lumbarization, scoliosis, obesity, long term medication use, noncompliance with medical treatment, and tobacco abuse.  *Id.* at 674.  Plaintiff was told to stop smoking and to lose weight.  *Id.*

March 31, 2015 treatment notes from Dr. Gentile indicate that he reviewed Plaintiff's x-rays from August of 2014 showing a horizontal tear within the posterior horn of the medial meniscus in Plaintiff's right knee, with associated chondromalacia and associated arthritis and effusion.  Tr. at 578.  His plan was a right knee diagnostic arthroscopy with debridement, partial medial meniscectomy versus repair, and possible lateral release.  *Id.*

On April 8, 2015, Plaintiff followed up with Dr. Kopey and she made the same narrative, review of systems, and physical examination findings as she did in February of 2015.  Tr. at 630-632.  She diagnosed Plaintiff with chronic pain, chondromalacia of the patellofemoral joint, meniscus tear, osteochondral defect of the femoral condyle, and osteoarthritis of the knee.  *Id.* at 632.  She recommended a knee brace, continuance of Plaintiff's medications, and continuance of his home exercises, ace wrap and ice.  *Id.*

On April 10, 2015, Plaintiff presented to Dr. Sutton for follow up of his left hip, right arm, left leg, knees, low back and shoulder pain, and sleep disturbances and anxiety.  Tr. at 671.  He was using a cane and knee brace and he reported gait difficulties and that he was scheduled for right knee surgery with Dr. Gentile on April 20, 2015.  *Id.*  He requested a referral to Dr. Kopey for his

-9-

shoulder pain on both sides. *Id*. Physical examination showed that Plaintiff had normal strength in his upper and lower right extremity, with 4/5 strength in his left lower extremity for foot dorsiflexion, knee flexion and extension and positive pain with right upper extremity shoulder abduction against resistance. *Id*. He also had decreased range of motion in his knees and numbness and tingling in his hips, knee and ankle. *Id*. Dr. Sutton diagnosed knee effusion, chondromalacia patellae, rotator syndrome, Schmorl's node in the lumbar spine, lumbarization, lumbar foraminal stenosis, obesity, tobacco abuse, and sleep disturbance. *Id*. at 670-671. Plaintiff was told to stop smoking and to lose weight. *Id*.

On May 8, 2015, June 8, 2015, and July 6, 2015, Plaintiff again presented to Dr. Sutton for pain management follow up. Tr. at 667. He reported at the May 8, 2015 follow up that he had right knee surgery and indicated that he was told that his knee was "bone on bone" and he would need a total knee replacement but was too young to receive it. Tr. at 665. He reported that he had a follow up with Dr. Kopey for his left hip. *Id*. He complained of shoulder stiffness and pain, sleep disturbances, anxiety, increased episodes of heart racing, and knee, left hip, right arm, left leg, and low back pain. *Id*. at 665-670. He also had numbness and tingling in his hips, knees and ankle and he admitted having gait difficulties. *Id*. He was using a cane and had his knee in a brace, but he reported that he had been trying to walk without the cane. *Id*. Physical examination showed that Plaintiff had normal strength in his upper and lower right extremity, with 4/5 strength in his left lower extremity for foot dorsiflexion, knee flexion and extension and positive pain with right upper extremity shoulder abduction against resistance. *Id*. Plaintiff's right knee was wrapped with an ace bandage plus in an immobilizer and his left knee was wrapped as well. *Id*. He also had decreased range of motion in his knees. *Id*. Dr. Sutton diagnosed chondromalacia patellae, acquired short leg, tear of the lateral meniscus in the knee, Schmorl's node in the lumbar spine, lumbarization, lumbar foraminal stenosis, HNP lumbar myelopathy, obesity, and tobacco abuse. *Id*. at 666-670. Plaintiff was told to stop smoking and to lose weight. *Id*.

On June 2, 2015, Plaintiff presented to Dr. Gentile for a 6-week follow up of his right knee diagnostic arthropscopy with partial medial and lateral meniscectomies and chondroplasty of the patellofemoral and medial compartments. Tr. at 576. Plaintiff reported that he was doing better and

-10-

had been able to wean himself off of his cane recently. *Id.* He indicated that he still had intermittent knee pains but not as bad as before the surgery. *Id.* Dr. Gentile conducted a physical examination and noted that Plaintiff should continue with range of motion and strengthening exercises for his right knee, but Plaintiff did have advanced degenerative changes to the right knee and at some point he would require a total knee replacement. *Id.* Dr. Gentile noted that he recommended trying to hold off on such a surgery for as long as possible due to Plaintiff's young age. *Id.*

On August 25, 2015, Plaintiff presented to Dr. Kopey and had a new complaint of left knee pain. Tr. at 633. He indicated that there was no new injury that caused this pain, and he also had low back, left hip, and bilateral knee pain that he described as aching, burning and shooting. *Id.* Physical examination showed no joint effusion, deformity, instability, swelling, erythema or warmth, normal range of motion in the spine and extremities, and tender bilateral medial knee joints and lumbosacral paraspinals. *Id.* at 635. She diagnosed Plaintiff with lumbar facet arthropathy, primary osteoarthritis of the right knee and left hip, and left knee pain. *Id.* She scheduled an x-ray of the bilateral knees and planned for a left knee brace depending upon the results. *Id.* She also continued Plaintiff's medications, gave him a handicap placard, and told him to continue his home exercises, ace wrap, and ice. *Id.* Dr. Kopey also prescribed a cane for Plaintiff. *Id.* at 686.

On August 4, 2015 and September 1, 2015, Plaintiff presented to Dr. Sutton for follow up of his left hip, right arm, left leg, knees and low back pain. Tr. at 661-664. Plaintiff reported that Dr. Kopey was getting an x-ray of his left knee and lumbar spine and she had scheduled him for epidurals in his lower back. *Id.* Physical examination showed that Plaintiff was using a cane and had normal strength in his upper and lower right extremity, with 4/5 strength in his left lower extremity for foot dorsiflexion, knee flexion and extension, and positive pain with right upper extremity shoulder abduction against resistance. *Id.* Plaintiff's right knee was wrapped with an ace bandage and in an immobilizer and his left knee was wrapped as well. *Id.* He had decreased range of motion in his knees. *Id.* Dr. Sutton diagnosed chondromalacia patellae, scoliosis, tear of the lateral meniscus in the knee, osteoarthritis in the knee, Schmorl's node in the lumbar spine, lumbarization, lumbar foraminal stenosis, HNP lumbar myelopathy, obesity, anxiety disorder, and

-11-

noncompliance with medical treatment as Plaintiff was still smoking.  *Id*. at 661-662.  Dr. Sutton refilled Plaintiff's medications and recommended weight loss and to stop smoking. *Id*. at 662.

On September 1, 2015, Dr. Sutton also completed an "Off-Task/Absenteeism Questionnaire" on behalf of Plaintiff.  Tr. at 678.  He opined that based upon his treatment and knowledge of Plaintiff, Plaintiff would likely be off-task at least 20% of the time, exclusive of a ½ hour for lunch and two 15-minute breaks.  *Id*.  Dr. Sutton explained that Plaintiff's chronic pain, HNP lumbar, lumbar stenosis, and osteoarthritis of the knee and meniscus tear would render him off-task and Plaintiff would be absent from work more than 4 times per month due to his impairments and treatments.  *Id*.  He further indicated that Plaintiff would be unable to pay attention and concentrate on a sustained basis due to chronic pain in the lumbar spine and knees, he would be drowsy and/or need to lie down and rest or sleep due to medication side effects, and the medications would impact his thought processes and delay his response time.  *Id*.  He also opined that Plaintiff would have difficulty walking or standing.  *Id*.

Dr. Sutton also completed a "Pain Questionnaire" on September 1, 2015 for the period of March 21, 2012 through the present for Plaintiff.  Tr. at 679.  He identified Plaintiff's chondromalacia patellae, scoliosis, meniscus tear in the knee, Schmorl's Node in the lumbar spine, lumbarization, lumbar foraminal stenosis, HNP lumbar myelopathy, obesity, and anxiety disorder as the impairments that were capable of producing pain and he described Plaintiff's subjective complaints as knee and lower back pain.  *Id.*  Dr. Sutton believed that Plaintiff's complaints were reasonably derived from an underlying impairment as established by his objective and clinical findings, and he explained that Plaintiff's pain was chronic in nature.  *Id*.  He opined that Plaintiff's pain was constantly severe enough to interfere with his attention and concentration.  *Id*.  He also opined that Plaintiff was truthful about his perception of pain.  *Id*.

Dr. Sutton also completed a "Medical Source Statement Regarding Knee Problem[3]" on September 1, 2015.  Tr. at 680-682.  He was asked to provide answers for the time period of March 21, 2012 through September 2015.  *Id*. at 680.  He diagnosed Plaintiff with HNP lumbar

---

[3]  The undersigned notes that this medical source statement does, perhaps erroneously, limit the statement to "Knee Problem," but Dr. Sutton responded based upon all of Plaintiff's impairments.  Tr. at 680.

myelopathy, lumbarization, lumbar foraminal stenosis, anxiety, Schmorl's mode on the lumbar spine, chondromalacia patellae, scoliosis, sleep disturbance, and a lateral meniscus tear and osteoarthritis of the knee. *Id*. When asked for a prognosis, Dr. Sutton indicated that it was good with continued therapy, probable surgical interventions, and monitoring of medications. *Id.* When asked to check whether the problems were on Plaintiff's left, right, or both knees, Dr. Sutton checked the lines of "Chronic Pain, Chronic Stiffness, Chronic Swelling, Chronic Tenderness, Crepitus, Instability" and indicated Plaintiff's back and left and right knees. *Id.* He also indicated that Plaintiff had "Limitation of Motion" in his back and left and right knees, "Joint Space Narrowing" in his back, "Bony Destruction" in his back and knees, and "Inability to Ambulate Effectively" in his back and knees. *Id*. He opined that Plaintiff's experience of pain would "constantly" be severe enough to interfere with his attention and concentration. *Id*. Dr. Sutton indicated that Plaintiff's impairments lasted or would be expected to last at least 12 months, and he wrote Plaintiff's functional limitations as "he would not be able to function appropriately and would likely cause further injury to himself and exacerbate current problems." *Id*. He opined that Plaintiff could walk less than 1 city block without rest or severe pain, he could sit for 20-30 minutes and stand for 15-20 minutes continuously at one time. *Id.* at 681. Dr. Sutton opined that Plaintiff could sit, and stand/walk less than 2 hours per 8-hour workday. *Id.* He concluded that Plaintiff would need to shift positions at will and would need to take unscheduled breaks, although it would depend upon when Plaintiff had spasms or cramping, but he would have to rest by sitting quietly or lying down for 30 minutes to 1 hour before returning to work per 8-hour workday. *Id.* He further opined that Plaintiff would have to have his legs elevated if he sat for a prolonged period of time in a comfortable position and his legs would have to be elevated 70-80% of the time if Plaintiff had a sedentary job. *Id*. at 681-682. Dr. Sutton further opined that Plaintiff could lift and carry up to 10 pounds occasionally and never lift and carry more, and frequently and he could never stoop and crouch in an 8-hour workday. *Id*. at 682. He indicated that Plaintiff's impairments would produce more "bad days" than "good days" and he estimated that Plaintiff would be absent more than 4 times per month due to his impairments or treatment. *Id*.

-13-

On September 11, 2015 Dr. Gentile completed an "Off-Task/Absenteeism Questionnaire" on behalf of Plaintiff.  Tr. at 638.  He opined that based upon his treatment and knowledge of Plaintiff, Plaintiff would likely be off-task at least 20% of the time, exclusive of a ½ hour for lunch and two 15-minute breaks.  *Id.*  Dr. Gentile explained that Plaintiff's meniscus tear and pain in the knee would render him off-task and Plaintiff would be absent from work about 3 times per month due to his impairment and treatment.  *Id.*

Dr. Gentile also completed a "Pain Questionnaire" for Plaintiff from March 21, 2012 through September 11, 2015, the date that Dr. Gentile completed the questionnaire. Tr. at 639.  He identified Plaintiff's meniscus tear and pain in the knee as the physical impairments that were capable of producing pain and he described Plaintiff's subjective complaint as knee pain.  *Id.*  Dr. Gentile believed that Plaintiff's complaints were reasonably derived from an underlying impairment as established by his objective and clinical findings, and he explained that Plaintiff may have pain and it would be hard for him to stand.  *Id.*  He was unable to say if there was a psychological component to Plaintiff's pain allegation and he opined that Plaintiff's pain would often be severe enough to interfere with his attention and concentration.  *Id.*  He also opined that Plaintiff was truthful about his perception of pain.  *Id.*

Dr. Gentile additionally completed a "Medical Source Statement Regarding Knee Problem" on September 11, 2015 for Plaintiff.  Tr. at 640-642.  He was asked to provide answers for the time period of March 21, 2012 through September 2015.  *Id.* at 640.  He diagnosed Plaintiff with chondromalacia of patellofemoral joint and a meniscus tear.  *Id.*  When asked for a prognosis, Dr. Gentile wrote "cont PT no restrictions."  *Id.*  When asked to check whether the problems were on Plaintiff's left, right, or both knees, Dr. Gentile checked the lines of "Chronic Pain, Chronic Stiffness, and Chronic Swelling," but did not indicate right, left or both knees.  *Id.*  He indicated that Plaintiff had degenerative changes and opined that Plaintiff's experience of pain would "often" be severe enough to interfere with his attention and concentration.  *Id.*  Dr. Gentile indicated that Plaintiff's impairments lasted or would be expected to last at least 12 months, and he wrote Plaintiff's functional limitations as "knee as tolerated no restriction."  *Id.*  He opined that Plaintiff could walk 1-2 city blocks without rest or severe pain, and he could sit and/or stand continuously

-14-

for more than 2 hours at one time. *Id.* at 641.  Dr. Gentile opined that Plaintiff could stand/walk about a total of 4 hours per 8-hour workday and sit at least 6 hours per 8-hour workday. *Id.*  He concluded that Plaintiff would need to shift positions at will and would need to take unscheduled breaks every 2-4 hours for 15 minutes per 8-hour workday. *Id.*  He further opined that Plaintiff could lift and carry up to 20 pounds frequently and he could stoop and crouch 50% of the time in an 8-hour workday. *Id.* at 642.  He was unsure if Plaintiff's impairments would produce "good days" and "bad days" and he estimated that Plaintiff would be absent about 2 times per month due to his impairments or treatment. *Id.*

### B.    Relevant Testimonial Evidence

At the ALJ hearing, Plaintiff's counsel asked that the ALJ give little to no weight to Dr. Gentile's opinion and give controlling weight to the opinions of Dr. Sutton. *Id.*  The ALJ then began questioning Plaintiff. Tr. at 36.  Plaintiff indicated that he was 42 years old and had an eighth grade education. *Id.* at 37.  He indicated that he tried a GED class, but he had to go to work and support his child. *Id.*  He testified that his fiancee lives with him and his niece lives next door. *Id.* at 36. He can read and perform simple math. *Id.* at 37.  He does not have a driver's license and explained that while he could pay the fines in order to obtain his license, he does not want a license because of the medications that he takes and the numbness in his right leg. *Id.* at 37-38.

Plaintiff reported that he was not working and had two worker's compensation cases pending. Tr. at 39-40.  He stated that the last time he worked was in 2011 when he tried to work at McDonald's for six weeks as his boss was his niece and she wanted to give him a chance to work there. *Id.* at 40.  He testified that he could not handle it. *Id.*  He indicated that he tried to work again in 2012 and lasted three weeks or less because every night when he came home, his knee was swollen and he had to stop working. *Id.*  He had prior employment as a tube catcher/cutoff operator at Bull Moose Tube/Warren Tube from 2002-2009, but he had an accident there when unjamming a line and hurt his right rotator cuff. *Id.* at 42-44.

The ALJ asked Plaintiff why he was unable to work and Plaintiff responded that he cannot lift anything very heavy and he cannot walk without a cane. Tr. at 51.  He further explained that he needed several surgeries and if he could get them done in the next 10 years, he would be happy to

-15-

return to work, but he was not able to perform the duties that he did in the past.  *Id*.  He reported that he had hip and right knee pain at the hearing and it was noted that he was moving around at the hearing.  *Id*.  He indicated that when he was on his medications, his pain level was at a 4 or 5 out of 10, but without the pain medications, his pain level was at 8.  *Id*. at 51-52.  He identified his pain medication as Roxicodone 30 milligrams XR.  *Id*. at 52.

Plaintiff further testified that his doctors are Dr. Sutton, Dr. Kopey and Dr. Gentile.  Tr. at 53-54.  He explained that Dr. Sutton checked him every month, he gets nerve blocks in his back and hips with Dr. Kopey, and Dr. Gentile is his surgeon.  *Id*. at 54.  He indicated that Dr. Gentile is supposed to do a total right knee replacement but he told Plaintiff that Plaintiff was too young for one.  *Id*. at 55.  He indicated that he has no side effects from his medications, but he has trouble sleeping which makes him fatigued during the day.  *Id*. at 55.  He explained that his anxiety has gotten worse and his depression is worse because he used to love working on cars for the past 25 years and now he can no longer do so as he cannot even vacuum the floor without his arm swelling.  *Id*. at 55-56.  He keeps to himself and does not like to be in crowds.  *Id*. at 56.

Plaintiff testified that he could walk for under 5 minutes with a cane and he cannot sit in one spot for 10-15 minutes without standing up to relieve his hip pain.  Tr. at 61.  He cannot lift and carry more than 5 pounds for very long as it makes his arm swell and he has problems reaching overhead with both arms.  *Id*. at 62.

Upon questioning from his attorney, Plaintiff indicated that he has to elevate his legs while he is sleeping at night and a few times during the day.  Tr. at 67.  He has his fiancee help him put his shirt and socks on each morning and he can do no household or outside chores.  *Id*.  When asked if Dr. Gentile was trying to wean him off of using a cane in June, Plaintiff replied that he was not and in fact told him to keep using the cane until he gets surgery.  *Id*.  at 70.  He testified that Dr. Gentile was the one who told Dr. Kopey to give Plaintiff a prescription for a cane until Dr. Gentile gives him a knee replacement.  *Id*. at 73.

The ALJ then questioned the vocational expert ("VE").  Tr. at 76.  She asked the VE to consider a hypothetical person with the same age, education and past relevant work experience as Plaintiff with: the ability to lift and carry up to 20 pounds occasionally and 10 pounds frequently;

-16-

the ability to walk and stand for 4 hours per 8-hour workday and sit up to 6 hours per workday; occasionally climb stairs and ramps; never climb ladders, ropes or scaffolding; balance occasionally; occasionally stoop, kneel, crouch and crawl; occasionally reach overhead bilaterally; and occasionally handle items with the right hand, which is the dominant hand. *Id*. at 76-77. The VE testified that such a hypothetical individual could not perform Plaintiff's past relevant work or any other jobs because of the occasional handling limitations. *Id*. at 77.

The ALJ modified the hypothetical individual to remove the occasional handling limitation and replace it with a frequent handling with the right dominant hand limitation. Tr. at 77. The VE responded that this hypothetical individual would not be able to perform Plaintiff's past relevant work, but he could perform jobs existing in significant numbers in the national economy, such as the jobs of a cashier II, an office helper or a recreation aide. *Id*. at 78-79. The VE prefaced her testimony by stating that the standing and walking for 4 hours per workday limitation does not meet the criteria for light work under the DOT, but her testimony was based upon other authoritative sources and her 30 years of professional experience. *Id*. at 78.

The ALJ modified the hypothetical individual to include the first hypothetical individual with an added limitation to sitting for up to 6 hours per 8-hour workday and standing/walking up to 2 hours of an 8-hour workday. Tr. at 79. The VE testified that this hypothetical individual could perform jobs existing in significant numbers in the national economy, such as the sedentary jobs of document preparer, final assembler, and surveillance monitor. *Id*. at 80.

In her fourth hypothetical individual, the ALJ limited him to sitting for up to 2 hours per 8-hour workday, standing/walking up to 2 hours per 8-hour workday, and lifting and carrying less than 10 pounds frequently and 10 pounds occasionally. *Id*. at 80-81. The VE testified that the sedentary jobs that she previously testified about would be available for such a person. *Id*. at 82.

The ALJ modified the fourth hypothetical individual by adding a need to lie down for the remaining time of an 8-hour workday after sitting and standing/walking for a total of 4 hours. Tr. at 82. The VE testified that if the lying down was over the 3 standard breaks of 5 minutes or more, no competitive work existed for such an individual. *Id*.

-17-

Plaintiff's counsel modified the ALJ's hypothetical individual, adding a need to elevate his legs above heart level for 2/3 times of the workday or more.  Tr. at 83.  The VE replied that no competitive work existed for such an individual.  *Id*.

Plaintiff's counsel indicated that he had reviewed the jobs of office worker, final assembler, cashier II, office helper, and recreation aide, and they all listed frequent reaching as a job requirement.  Tr. at 83.  When he asked if this requirement was inconsistent with the limitation of occasional reaching bilaterally, the VE responded that it was.  *Id*.  The VE indicated that this would not bar the surveillance system monitor or electronics assembler jobs that were also available since they required only occasional reaching.  *Id.* at 83-84.

Plaintiff's counsel also modified hypothetical individuals two, three and four by adding an absence from the job by the hypothetical individual of at 4 or more days per month.  Tr. at 86.  The VE testified that no jobs would be available for such a hypothetical individual.  *Id.*

The ALJ then asked the VE about employer tolerance for being off task beyond the 2 15-minute breaks and half an hour lunch break customarily tolerated.  Tr. at 87.  The VE testified that the tolerance would be for no more than 10% of the workday and/or no more than 1 to 2 very brief breaks, like additional breaks of up to 5 minutes throughout the workday.  *Id.*

### III.      SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

In her February 24, 2016 decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 21, 2012, the alleged onset date, and she found that since that date, Plaintiff had the severe impairments of DDD of the lumbar spine, osteoarthritis of the right shoulder and left hip, and status post right knee meniscectomy.  Tr. at 18.  The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1.  *Id.* at 19.  After considering the record, the ALJ found that Plaintiff had the RFC to perform light work with the following limitations: standing and walking 4 hours per 8-hour workday; sitting up to 6 hours per 8-hour workday; occasional climbing of stairs and ramps, but no climbing of ladders, ropes or scaffolds; occasional balancing, stooping, kneeling, crawling and crouching; occasional reaching overhead bilaterally, and frequent handling with the right hand.  *Id.*

-18-

Based upon Plaintiff's age, education, work experience, the RFC, and the VE's testimony, the ALJ determined that Plaintiff could not perform his past relevant work, but he could perform jobs existing in significant numbers in the national economy, such as cashier II, office helper, and recreation aide.  Tr. at 22.  In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, and he was not entitled to DIB or SSI from March 21, 2012, through the date of her decision.  *Id.*

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## VI.  LAW AND ANALYSIS

### A.  RFC

Plaintiff asserts that substantial evidence does not support the ALJ's RFC finding for him because she made inconsistent findings regarding his ability to handle objects.  ECF Dkt. #13 at 19-20; ECF Dkt. #15 at 2.  Plaintiff contends that the ALJ's RFC inconsistency is not harmless error because the VE testified that no jobs are available for the ALJ's hypothetical individual who had an occasional handling limitation, but jobs were available for the hypothetical individual who had a limitation of frequent handling.  ECF Dkt. 13 at  #19-20.  In defending the ALJ's decision, Defendant asserts that the ALJ did not address this inconsistency "because she did not think she was making an inconsistent finding, and, instead, mistakenly listed later in her decision that Plaintiff was limited to occasional handling with his right hand when she meant to say that he was limited to

frequent handling with his right hand." ECF Dkt. #14 at 15. Defendant cites to medical and non-medical evidence that she thinks supports a finding by the ALJ that Plaintiff was limited to frequent and not occasional handling. *Id.* at 15-16. Defendant adds that "[n]o doctor opined that Plaintiff was limited to occasional handling with his right hand." *Id.* at 14, citing Tr. at 20-21, 104-105, 136-137, 638-642, 678-682.

The undersigned recommends that the Court find that the ALJ did make inconsistent findings regarding Plaintiff's ability to handle in her decision. In her RFC summary paragraph on page 4 of her decision, the ALJ specifically finds that Plaintiff "can frequently handle with the right hand." Tr. at 19. However, on page 6 of her decision, when explaining why she attributed great weight to the agency reviewing physician opinions, the ALJ states that "[t]he state agency physicians determined that Plaintiff had the unlimited ability to handle bilaterally. I have modified this to only occasional handling with the dominant right hand. This limitation is more consistent with the evidence in this case." *Id.* at 21.

Defendant attempts to tell the Court what the ALJ "meant" to say and offers the explanation that the ALJ did not address the inconsistency because "she did not think" that she was making an inconsistent finding, and she "mistakenly" listed later in her decision the occasional handling finding. ECF Dkt. #14 at 15. However, Defendant fails to explain how she knows what the ALJ "meant" to say or how she knows what the ALJ was thinking. The Court should reject this assertion.

Further negating a finding of clerical error is the ALJ's explanation of why she was modifying the handling limtiation. The ALJ does not merely state that she modified the handling limitation. Rather, she specifically notes that the agency reviewing physicians found that Plaintiff had unlimited abilities to handle, bilaterally, and she was modifying this to occasional handling with the dominant right hand because the "limitation was more consistent with the evidence in this case." Tr. at 21. While she does not cite to the evidence upon which this modification was based, the fact that she concluded that the modification was more consistent with the evidence lends support for a finding that this was not just an oversight or clerical error.

In addition, while Defendant is correct that no physician opined an occasional handling limitation for Plaintiff, it is the ALJ who ultimately determines a claimant's RFC, not a physician.

-21-

20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5.  And Dr. Kopey did indicate in her treatment notes that Plaintiff had a medical history which included diagnoses of right hand neuropathy.  Tr. at 581, 630, 633.

Moreover, Plaintiff testified at the hearing about his failed right rotator cuff surgery and he explained that he had trouble handling objects, such as groceries, because he could not hold more than 5 pounds for very long.  Tr. at 63-64.  He also testified that he drops lit cigarettes without realizing it because his right hand goes numb.  *Id*. at 69.  He further stated that he cannot do things like write a letter without taking a break because his right wrist clicks and his arm starts to swell. *Id*. at 63.  The ALJ did set forth the law on credibility determinations and she concluded that while Plaintiff's impairments could reasonably be expected to cause his  symptoms, she did not find that his statements concerning the intensity, persistence and limiting effects of his symptoms were entirely credible.  *Id*. at 20.  However, the ALJ makes no further findings regarding Plaintiff's credibility and she provides no explanation as to which parts of Plaintiff's statements that she did find credible.

Since the ALJ's decision contains inconsistent handling limitations without explanation, Plaintiff testified as to limitations in handling at the hearing, Plaintiff's medical history includes right hand neuropathy and failed right rotator cuff surgery, and the ALJ failed to explain her credibility finding, the undersigned recommends that the Court remand the instant case.  The ALJ's error is not harmless error because the VE testified that an occasional rather than frequent handling limitation would lead to a finding that no jobs were available in the national economy for the ALJ's hypothetical individual with this modified limitation.  Tr. at 76-77.

## B.    Treating Physician Rule

Plaintiff also asserts that the ALJ violated the treating physician rule by failing to identify the
weight that she attributed to Dr. Sutton's opinions and by failing to explain why she did not accept the opinions of Drs. Sutton and Gentile that Plaintiff would be off-task at least 20% of the workday and would be absent at least 2 days per month due to his impairments and treatments. ECF Dkt. #13

at 20-24.  Since the undersigned is recommending that the Court remand the instant case based upon the ALJ's inconsistent RFC finding, the undersigned further recommends that the Court decline to address this alleged error because the physicians' opinions and findings are part of the ALJ's RFC determination.

However, the undersigned notes that the ALJ's review of the opinions of Drs. Sutton and Gentile is relatively cursory, especially those of Dr. Gentile.  Further, the ALJ does fail to mention the off-task and absenteeism findings by these treating physicians in her decision, and she fails to address their opinions concerning Plaintiff's need to take unscheduled breaks and his need to shift positions.  The ALJ also failed to address Plaintiff's use of a cane and she failed to address why she gave the most weight to the opinions of the agency reviewing physicians, but did not follow most of their determinations, including that Plaintiff was limited to sedentary work, he had to use a cane, he had a limited ability to push and pull or use foot pedals as to his left extremity, and his overhead reaching with his right arm was limited.  Tr. at 97, 136-137, 140.  The ALJ should address these issues on remand as well in reevaluating and reviewing Plaintiff's RFC.

## VII.  CONCLUSION AND RECOMMENDATION

For the following reasons, the undersigned recommends that the Court REVERSE the decision of the ALJ and REMAND the instant case for reevaluation and review of Plaintiff's RFC as explained in this Report and Recommendation.

Date: July 20, 2018                         /s/George J. Limbert
                                            GEORGE J. LIMBERT
                                            UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).